**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kenneth F. BOULA and Earl D. Gordon,**
**Defendants–Appellants.**

**Nos. 92–1749 and 92–1750.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1992.

Decided June 21, 1993.

Barry R. Elden, Asst. U.S. Atty., Jonathan C. Bunge (argued), Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Edward C. Stewart (argued), McDermott, Will & Emery, Walter Jones, Jr., Pugh, Jones & Hubbard, Chicago, IL, for defendants-appellants.

Before COFFEY and EASTERBROOK, Circuit Judges, and LAY, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Kenneth Boula and Earl Dean Gordon pled guilty to three counts of mail fraud. 18 U.S.C. § 1341. Pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the district court sentenced the defendants to 108 months imprisonment. The defendants appealed their sentences. In *United States v. Boula*, 932 F.2d 651 (7th Cir.1991) (*"Boula I"*)[1], we vacated these sentences and remanded for resentencing because we deemed the district court's ten point upward departure in the defendants' base offense level excessive. The district court then resentenced the defendants to 62 months imprisonment and three years supervised release, and ordered each defendant to

---

* The Honorable Donald P. Lay, Senior Judge of the Eighth Circuit, is sitting by designation.

1. We need not set out in detail the background facts of this case since they are recounted in *Boula I*.

pay $5 million in restitution. These second sentences are the subject of the instant appeal. The district court, in a published order, explained its reasoning for imposing these sentences. 787 F.Supp. 819 (N.D.Ill. 1992). The court explained that the base offense level for fraud, the crime for which the defendants were convicted, was six. U.S.S.G. § 2F1.1(a). Because the loss from the fraud was $7 million, the offense level was increased eleven points. U.S.S.G. § 2F1.1(b)(1)(L). Another two points were added since the crime involved "more than minimal planning" and "more than one victim". U.S.S.G. § 2F1.1(b)(2)(A) & (B). Since Boula and Gordon were both organizers or leaders of the criminal activity, the offense level was raised another four points. U.S.S.G. § 3B1.1(a). The district court reduced the defendants' offense level by two points because they accepted responsibility for their crime. U.S.S.G. § 3E1.1. The defendants were left with an adjusted base offense level of twenty-one. The district court then ordered a three level upward departure in their sentences based on Application note 1 to § 2F1.1. That note states that "[i]f in a particular case ... several of the enumerated factors [in § 2F1.1(b)(2)] applied, upward departure might be warranted." U.S.S.G. § 2F1.1, comment. (n.1). Since two of those factors were present in this case—the offense involved more than minimal planning and more than one victim was defrauded—the district court ordered the three-point upward departure.

▮ Boula and Gordon attack the district court's decision to depart upward. Initially, they argue that the departure was inappropriate because effective November 1, 1989, § 2F1.1 was amended to eliminate the coincidence of "more than minimal planning" and "more than one victim" as possible grounds for upward departure referred to in Application Note 1. The defendants maintain that because Congress has dictated that courts must impose sentences in accordance with the Guidelines "that are in effect on the date the defendant is sentenced", 18 U.S.C. § 3553(a)(4), they are entitled to the benefit of this amendment in § 2F1.1 which became effective after they committed their crime but before they were sentenced. *The defen-*

*dants, however, are selective about which provisions of the post-November 1, 1989 Guidelines they wish applied to their sentence. This is because the November 1, 1989 amendments did more than just eliminate a possible grounds for departure; they also instructed courts to increase by fourteen points the base offense level for frauds involving losses of between $5 and $10 million, up from an eleven-point increase mandated by the pre-November 1, 1989 Guidelines.* U.S.S.G. § 2F1.1(b)(1)(O) & (P). *The defendants want the best of both versions of the sentencing Guidelines: they want us to apply the pre-November 1, 1989 loss table which calls for only an eleven level increase for their $7 million fraud and the post-November 1, 1989 application note which eliminates the coincidence of more than minimal planning and more than one victim as a ground for upward departure.*

The defendants are correct that the district court sentenced them under the Guidelines in effect on the date they committed their crime, rather than the ones in effect on the date they were sentenced. The district court explained its reasons for sentencing under the earlier version of the Guidelines:

"The defendants were originally sentenced in June of 1990, after the November 1989 amendments took effect. At that time this court applied the pre–1989 guidelines because applying the amendments would have increased the defendants' base offense level by 3 points (base offense level of 20 for loss in excess of 5,000,000 § 2F1.1) This retrospective application of an increased penalty is prohibited. See generally, *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)."

787 F.Supp. at 822 n. 2. The district court, however, rejected the defendants' argument that it should apply the pre- and post-November 1989 Guidelines in "piecemeal fashion", 787 F.Supp. at 822, in order to arrive at the shortest possible sentence. The court explained that it

"agreed with the reasoning of other courts in cases such as *United States v. Stephenson,* 921 F.2d 438, 441 (2d Cir.1990) in which that court held that the guidelines

*were intended to be applied as a 'cohesive and integrated whole'* and *United States v. Lenfesty,* 923 F.2d 1293, 1299 (8th Cir. 1991) in which the Eighth Circuit held that the 'most reasonable interpretation of these [guideline] provisions is that they move in concert.'"

*Id.* 787 F.Supp. at 822 n. 2 (emphasis added).

The defendants raise this same argument on appeal, contending that the district court was required to sort through the Guidelines provisions in effect when the crime was committed and those in effect at the time of sentencing, and apply the provisions from each which would result in the lowest possible base offense level. We join the other three Circuits which have addressed this issue, and the district court in this case, in rejecting the defendants' argument. As the Second Circuit reasoned,

"[t]he Sentencing Commission intended the Guidelines to be applied as a 'cohesive and integrated whole.' ... *see* United States Sentencing Commission, *Guidelines Manual* § 1B1.1. (Nov.1987) ...; *see also United States v. Lawrence,* 916 F.2d 553, 555 (9th Cir.1990) ("By allowing the guidelines to take effect, Congress has sanctioned the approach of the Commission, which, as expressed by the Commission's 'Application Instructions' of § 1B1.1, requires that the guidelines be read as a whole."). *Applying various provisions taken from different versions of the Guidelines would upset the coherency and balance the Commission achieved in promulgating the Guidelines. Such an application would also contravene the express legislative objective of seeking uniformity in sentencing.*"

*United States v. Stephenson,* 921 F.2d 438, 441 (2d Cir.1990) (emphasis added); *see also United States v. Warren,* 980 F.2d 1300, 1304–1306 (9th Cir.1992) (adopting the *Stephenson* reasoning); *United States v. Lenfesty,* 923 F.2d 1293, 1299 (8th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991) (holding that because two related provisions of the Guidelines "move in concert" the sentencing court correctly applied the two sections from the same version of the Guidelines). This approach is expressly supported by the most recent statement of the Sentencing Commission. Section 1B1.11, p.s., which became effective November 1, 1992, provides:

> (a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

> (b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

> (2) *The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual.* However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.

(Emphasis added). We agree with the district court that defendants are to be sentenced under only one version of the Guidelines.

The defendants next argue that the district court's three-level upward departure was unreasonable. We apply a three-step approach to review sentencing departures: (1) we review de novo whether a district court's stated grounds for departure may be relied on to justify the departure; (2) we review for clear error whether the facts that support the grounds for departure actually exist in the case; and (3) we review for abuse of discretion whether the district court departed by a reasonable degree. *United States v. Willey,* 985 F.2d 1342, 1349 (7th Cir.1993). In *Boula I,* we upheld the grounds upon which the district court relied in ordering the departure: the pre-November 1, 1989 application Note 1 to § 2F1.1, which explains that departures may be warranted if two or more of the § 2F1.1(b)(2) provisions are satisfied. U.S.S.G. § 2F1.1,

comment. (n.1). *Boula I,* 932 F.2d. at 656. Defendants provide us with no reason to revisit that determination. Our earlier opinion expressly stated that "[b]ecause of the seriousness of this crime and the application note to section 2F1.1, which does allow for departure when 'more than minimal planning' and 'more than one victim' were involved in the fraudulent activity, some departure from the offense level, as properly calculated under the Guidelines, is appropriate." *Boula I,* 932 F.2d at 658. We also noted that in the post-November 1, 1989 version of § 2F1.1, the defendants' base offense level would be raised fourteen points because of the amount of loss involved in their fraud ($7 million), three levels higher than under the earlier § 2F1.1 loss table. *Boula I,* 932 F.2d at 657 n. 6. We commented that this three-level "difference may serve as a guidance in determining an appropriate degree of departure...." *Id.* In ordering the three-level upward departure, the district court cited our suggestion in *Boula I* that this was an appropriate degree of departure. 787 F.Supp. at 823 n. 3. As we recounted in *Boula I,* the defendants conducted a complex and massive mail fraud scheme that duped thousands of unwary investors and inflicted a loss of $7 million. 932 F.2d at 652–53. The three-level upward departure leaves the defendants with a total offense level identical to the one they would have received under the Guidelines in effect on the date they were sentenced, evidence that the departure is consistent with the structure of the Guidelines. For this reason, it would have made no difference to the defendants if the district court had applied the Guidelines in effect on the date they were sentenced. The resulting base offense level would have been identical, although arrived at by different routes: through the three-point upward departure under the earlier version and through the higher adjustment required by the amended § 2F1.1(b)(1) loss table in the later version. This is why the defendants argued that they should be sentenced under a hybrid of the two Guidelines versions, rather than under one or the other.

■ The defendants suggest that by looking to the amended § 2F1.1 loss table as a guide in departing the district court was in effect applying the later version of the Guidelines, although it claimed it was applying the earlier version. We disagree. The district court, following our suggestion in *Boula I,* simply used the later version of the Guidelines as a guide in departing upward. We have only recently approved such a use of subsequent Guidelines. *Willey,* 985 F.2d at 1350.

■ The defendants also challenge the district court's order that they pay $5 million in restitution to their victims.[2] Initially, they claim that the district court did not adequately consider their ability to pay in imposing the restitution requirement. We will reverse a district court's order of restitution if it is "not improbable" that the court failed to consider a mandatory factor set forth in 18 U.S.C. § 3664 and will sustain the order if the district court did consider the factors listed in the statute. *United States v. Helton,* 975 F.2d 430, 432 (7th Cir.1992). Moreover, we will not disturb a district court's decision to order restitution or the amount of restitution demanded unless the defendant is able to show that the district court abused its discretion. *Id.*

■ As the defendants point out, the defendants' "financial resources" and "earning ability" are among the factors district courts are required to consider before setting the amount of restitution. 18 U.S.C. § 3664(a). Our review of the record persuades us that the district court did consider the defendants' ability to pay as required by the statute. As in *Helton,* the court had before it a full presentence report on Boula and Gordon. 975 F.2d at 432. The reports described in detail the defendants' financial situation, including their family obligations and their marital ties, mental, emotional and physical conditions, educational and employment his-

---

2. The defendants apparently have entered into a settlement in a civil class action filed against them arising from their fraud. Defense counsel stated at oral argument that this settlement "is not relevant for purposes of their criminal sentence." Therefore, we need not consider any relationship between the class action settlement and the appropriateness of the restitution ordered.

tory, debts and liabilities, and current earning capacity. For example, the reports provided the district court with the following information: Boula had no dependents, was working towards a degree in computer science while in prison, and had a net worth of $16,945; Gordon also had no dependents and his net worth was $11,642.

At the defendants' sentencing hearing the district court explained that he was ordering restitution so that "if the time comes when these people are released and do have any monetary capacity, they must respond to the restitution issue ... [T]hey will pay restitution if they have the money." Like the district court in *Helton*, 975 F.2d at 433, the district court expressed some skepticism that the defendants would be able to make complete restitution. Nevertheless, the court stated that the defendants are "only going to have to give it their best effort, that's all. If they make money, they pay restitution. If they don't make money, they don't pay restitution." These comments establish that the district court considered the defendants' ability to pay in entering its restitution order and concluded that, although they did not currently have the funds to pay the restitution amount, they might very well earn sufficient money after their release from prison to make such payments.

■ In their reply brief, the defendants recast their argument by claiming that it was not enough for the court to merely consider the defendants' ability to pay restitution. They argue that the defendants will be unable to make the full $5 million in restitution and that therefore the restitution order was erroneous, citing in support of this proposition *United States v. Mahoney*, 859 F.2d 47, 52 (7th Cir.1988), where we vacated a restitution order we considered a "sham" since the defendant did not have "at least a hope of fulfilling" what we termed an "impossible order of restitution". However, we stated in *United States v. McClellan*, 868 F.2d 210, 213 (7th Cir.1989), that "[t]he circumstances in *Mahoney* ... left 'little doubt' that the judge 'simply forgot or disregarded' the de-

fendant's limited income and the special needs of his dependents, particularly his disabled wife." In contrast, as we have already noted, the district court in this case did consider the defendants' ability to pay. Moreover, as we stated in *McClellan*, the restitution "statute does not say that indigency is a defense, only that it is a factor the judge is required to take into account." 868 F.2d at 213 (quoting *United States v. Fountain*, 768 F.2d 790, 802–03 (7th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986)); *see also United States v. House*, 808 F.2d 508, 510 (7th Cir.1986) (That a defendant is "indigent ... does not preclude an award of restitution.") In ordering the restitution, the district court commented on the "immensity of the talent and the intelligence and the articulateness of the defendants" and the fact they had engineered a "complex" fraud. He stated that he was ordering the restitution "so that if the time comes when these people are released and do have any monetary capacity, they must respond to the restitution issue." "[I]f money should be found, if money should become available, if money should be earned ...", the defendants should pay restitution.[3] The district court explained that he was ordering the restitution so that the defendants "will make every effort they can to restore to some extent the monies that have been lost by an awful lot of people" because of their crime. The judge continued:

"People have been hurt, people have been crushed, people who have saved money for their kids' college education, people that put in IRAs, people who have put in their investment for their retirement, people who have wanted to buy homes and lost the equity that they were hoping to put forward some day. There is as many different kinds of tragedies out there as you could possibly imagine ..."

Under these circumstances, the district court did not abuse its discretion in ordering restitution greater than the defendants' current assets. Given the ingenuity and capabilities the defendants demonstrated in concocting their fraudulent scheme, we are of the opin-

---

**3.** This in no way affects or impacts upon the defendants' obligations under the settlement agreement they reached in the civil class action.

This language refers only to the defendants' restitution obligation imposed as part of their criminal sentences.

ion that there is more than a possibility that they will be able to earn sufficient money upon their release from prison to reimburse the thousands of victims they so maliciously preyed upon. If the defendants are not seriously interested in making full restitution to their victims, this order should overcome that problem and provide them with the necessary incentive and motivation to make those payments in a timely fashion.

The defendants also attack the restitution order as "improperly open-ended" since it did not set a specific payment schedule. The district court ordered that the defendants "pay Restitution in the amount of FIVE MILLION ($5,000,000) when released from custody in a manner to be suggested by the probation officer and when [they have] the capacity to do so." The defendants incorrectly cite *United States v. Sasnett*, 925 F.2d 392 (11th Cir.1991) in support of their assertion that the district court erred in not establishing a payment schedule at the time of sentencing. In *Sasnett*, the district court did not order restitution at sentencing but left open the possibility that the restitution issue could be "reopened" in the future. *Id.* at 398. The Eleventh Circuit rejected this approach, holding that district courts may not "leave the question of restitution open to an uncertain date." *Id.* at 398–99. The district court in the instant case left open the *exact timing* of the defendants' restitution obligations, not whether or not restitution would be ordered. District courts are authorized to require defendants to make restitution "within a specified period or in specified installments", 18 U.S.C. § 3663(f)(1). "Unless there is such a period or installment," the limitations period "is inapplicable. So when an order to pay restitution does not establish a period or set a schedule of installments, it also is not limited in time." *House,* 808 F.2d at 511. The statute also states that if *"not otherwise provided by the court ...* restitution shall be made immediately." 18 U.S.C. § 3663(f)(3) (emphasis added). Here the district "otherwise provided" that the defendants pay restitution when they have the "capacity to do so." Since it is uncertain when the defendants will be able to fulfill their restitution obligations, it would have made little sense for the court to set a rigid payment schedule at the time of sentencing.

However, 18 U.S.C. § 3663 clearly places responsibility for the setting of the restitution order with the district court. We have held that restitution orders must be accompanied by "specific ... directions" delineating the defendants' obligations. *United States v. Lovett,* 811 F.2d 979, 990 (7th Cir. 1987). In this case, we are of the opinion that the district court left too much discretion for the management of the restitution order in the hands of the probation department. The district court should have ordered the defendants to begin paying restitution upon release from prison, with the understanding that if the original restitution ordered proves to be insurmountable, the defendants and the probation officer should return before the court. The important point is that the district court must make clear in its order that it is retaining supervision and control over the defendants, including the payment of restitution, and that any problems encountered in the enforcement of the order, by either the probation department or the defendants, must be brought to the sentencing judge's attention for resolution by him. We VACATE the district court's order of restitution and REMAND with instructions to enter an order in accordance with this opinion. In all other respects, the defendants' sentences are

AFFIRMED.